2004 UT 59

**Chris S. MAHANA and Rick Warner Toyota, Plaintiffs and Appellees,**

v.

**ONYX ACCEPTANCE CORPORATION and GLS Recovery, Inc., Defendants and Appellants.**

No. 20010892.

Supreme Court of Utah.

July 9, 2004.

P. Bryan Fishburn, Salt Lake City, for plaintiffs.

Evan A. Schmutz, Curtis R. Hussey, Provo, for defendants.

PARRISH, Justice:

¶ 1 This appeal arises from a dispute over the rightful ownership of a 1994 Mazda pick-up truck. Shortly after purchasing and financing the truck in California, the purchasers disappeared and defaulted on their loan payments. The truck surfaced in Arizona, where it was sold several times. It then made its way to Utah, where nineteen-year-old Chris Mahana purchased it from Rick Warner Toyota. Three years later, after learning that the truck was in Utah, the entity that had financed the original California purchase, Onyx Acceptance Corporation

("Onyx"), hired GLS Recovery Services, Inc. ("GLS") to repossess it. GLS removed the truck, along with personal items of Mahana's located inside, from the parking lot of a Home Depot store where Mahana was working.

¶ 2 Mahana and Rick Warner Toyota sued Onyx and GLS for conversion. Mahana and Rick Warner Toyota prevailed in the district court, and Onyx appeals. We affirm.

## FACTUAL BACKGROUND

¶ 3 In early 1995, Thomas and Silvia Hartley purchased the Mazda truck in California. The Hartleys financed the purchase through a loan from Onyx. On March 26, 1995, the state of California issued a certificate of title to the Hartleys reflecting the Onyx lien. Shortly thereafter, the Hartleys stopped making payments to Onyx and disappeared with the truck.

¶ 4 A few months later, unbeknownst to Onyx, the state of Arizona issued a certificate of title for the truck in the name of Sonny Nicholas. Onyx's lien was not reflected on the Arizona title. A second Arizona title, also reflecting no lien, was subsequently issued to a Mike Fostino. The truck then passed through two Arizona car dealers. In September of 1995, approximately five months after the issuance of the original California title, the truck was purchased by Rick Warner Toyota, a Utah car dealer, at the Southwest Auto Auction in Chandler, Arizona.

¶ 5 Rick Warner Toyota brought the truck to Utah. About three months later, in December of 1995, Rick Warner Toyota sold the truck to Mahana. Mahana financed the purchase of the truck through Zions Bank and faithfully made the required payments for nearly three years. It was not until November of 1998 that GLS, acting on behalf of Onyx, repossessed Mahana's truck.

¶ 6 After finding that Zions Bank was not responsible for the repossession, an undoubtedly bewildered Mahana demanded that GLS return the truck. Zions Bank also notified GLS that it held a Utah certificate of title naming it, rather than Onyx, as lienholder. GLS relayed this information to Onyx. In

addition, a sales manager from Rick Warner Toyota spoke to Onyx and explained that Rick Warner Toyota had purchased the truck in Arizona, relying on an Arizona certificate of title that reflected no lien.

¶ 7 Onyx responded to this information by ordering its employee to "immediately" move the truck out of Utah "ASAP." With the assistance of truck transporter "No Procrastination Joe Boyland," Onyx transported the truck to Nevada. Onyx then mailed a notice of repossession and intent to sell the truck to the Hartleys' last known California address, despite the fact that Onyx knew the Hartleys no longer lived there. Onyx failed to send a similar notice to Mahana. Thereafter, Onyx sold the truck.

¶ 8 In February of 1999, Mahana and Rick Warner Toyota filed suit against Onyx and GLS for conversion. Because Mahana was without transportation, but was still making payments on his truck loan to Zions Bank, Rick Warner Toyota provided Mahana with a series of small vehicles from its inventory on a courtesy basis. In April of 2000, after the district court had determined on summary judgment that Onyx was liable for conversion, but before the trial on damages, Onyx repurchased the truck and returned it to Mahana. By then, it had been driven an additional 10,000 miles, its interior had been damaged, and Mahana's personal property that had been inside the truck at the time of its repossession was missing.

¶ 9 The dispositive question presented by Mahana's conversion action is whether Mahana's interest in the truck was superior to any interest held by Onyx. On cross-motions for summary judgment, the district court found in favor of Mahana on this issue. Following a bench trial on damages, the district court awarded Mahana compensatory damages of $11,880 for lost use of the truck, as well as punitive damages of $25,000 based on the district court's finding that Onyx showed a "knowing and reckless indifference toward and disregard of" Mahana's rights.

## ANALYSIS

¶ 10 Onyx raises four claims on appeal. Onyx first challenges the district court's ruling with respect to Onyx's liability for conversion. Its three remaining challenges relate to the district court's award of both compensatory and punitive damages.

¶ 11 With respect to the liability challenge, Onyx argues that it cannot be liable for conversion because Onyx's security interest in the vehicle was superior to Mahana's interest by virtue of the applicable provisions of the Uniform Commercial Code ("U.C.C."), which were then in effect in both Utah and Arizona.[1] *See* Utah Code Ann. § 70A–9–103(2)(d) (1999) (repealed effective July 1, 2001); Ariz.Rev.Stat. § 47–9103(B)(4) (1999) (repealed effective July 1, 2001).

¶ 12 In challenging the damage awards, Onyx maintains that the district court's compensatory award was excessive, because it was greater than the total amount Mahana paid for the truck. Onyx also contends that it should be entitled to offset the compensatory award by the amount that Mahana recovered from a bond posted in Arizona. Finally, Onyx maintains that punitive damages are not appropriate in cases such as this where the underlying liability turns on unsettled questions of law. We affirm the district court with respect to all four of the challenges raised on appeal.

## I. ONYX'S LIABILITY FOR CONVERSION

¶ 13 Onyx's liability for conversion was premised on the district court's holding that Mahana's interest in the truck was superior to any interest held by Onyx. The relative priority of interests is governed by statute. We review the district court's interpretation of statutes for correctness, giving no deference to its conclusions. *Ward v. Richfield City*, 798 P.2d 757, 759 (Utah 1990).

¶ 14 Article 9 of the U.C.C., in effect in both Utah and Arizona at the relevant time, protects non-dealer purchasers who rely on

1. Article 9 of the U.C.C. and the corresponding provisions of both Utah and Arizona law have been revised since the events giving rise to Maha-

na's claim for conversion. Therefore, the provisions governing the priority of Onyx's lien are no longer in force.

unencumbered or clean certificates of title to goods and who are otherwise unaware of prior security interests. *See* Utah Code Ann. § 70A–9–103(2)(b), (d) (1999) (repealed effective July 1, 2001); Ariz.Rev.Stat. § 47–9103(B)(2), (4) (1999) (repealed effective July 1, 2001). Such purchasers are commonly referred to as "bona fide purchasers." *See, e.g., Timm v. Dewsnup,* 921 P.2d 1381, 1393 n. 7 (Utah 1996) (defining the term "bona fide purchaser"). The relevant statute provides:

> If goods are brought into this state while a security interest therein is perfected in any manner under the law of the jurisdiction from which the goods are removed and a certificate of title is issued by this state and the certificate does not show that the goods are subject to the security interest or that they may be subject to security interests not shown on the certificate, the security interest is subordinate to the rights of a buyer of the goods who is not in the business of selling goods of that kind to the extent that he gives value and receives delivery of the goods after issuance of the certificate and without knowledge of the security interest.

Utah Code Ann. § 70A–9–103(2)(d) (1999) (repealed effective July 1, 2001); Ariz.Rev. Stat. § 47–9103(B)(4) (1999) (repealed effective July 1, 2001). We will refer to this provision as the Bona Fide Purchaser provision.

¶ 15 The Bona Fide Purchaser provision is subject to an exception, however. When collateral in which a lender has a perfected security interest is removed from the state that issued the certificate of title, the U.C.C. establishes a four-month period during which the security interest remains perfected as against a subsequent bona fide purchaser in the new state. From the perspective of the lienholder, this constitutes a grace period during which the lienholder retains priority over a bona fide purchaser and during which the lienholder has an opportunity to re-perfect its security interest in the new jurisdiction. The operative provision states:

> Except as otherwise provided in this subsection, perfection and the effect of perfection or nonperfection of the security inter-

est are governed by the laws, including the conflict of law rules, of *the jurisdiction issuing the certificate until four months after the goods are removed* from that jurisdiction *and thereafter until the goods are registered in another jurisdiction,* but in any event not beyond surrender of the certificate. After the expiration of that period, the goods are not covered by the certificate of title within the meaning of this section.

Utah Code Ann. § 70A–9–103(2)(b) (1999) (emphasis added) (repealed effective July 1, 2001); Ariz.Rev.Stat. § 47–9103(B)(2) (1999) (repealed effective July 1, 2001). We will refer to this section as the Governing Law provision.

¶ 16 The Bona Fide Purchaser provision establishes a general rule that a perfected security interest reflected only on the certificate of title issued by a prior jurisdiction is subordinated to the interest of a bona fide purchaser when goods are moved to a new jurisdiction. The Governing Law provision operates as an exception to that general rule by establishing that the Bona Fide Purchaser provision in the new state's law does not apply until after the expiration of a four-month grace period during which the lienholder has an opportunity to re-perfect his security interest in the new jurisdiction.

¶ 17 The district court held that the Bona Fide Purchaser provision and the Governing Law provision operated to extinguish Onyx's security interest in the truck under the circumstances presented here. We agree. Chris Mahana bought the truck relying on a certificate of title issued by the state of Arizona that reflected no lien. It is undisputed that Mahana was not in the business of selling vehicles and that, when he bought the truck, he had no knowledge of Onyx's security interest. Although the precise date on which the truck was removed from California was not established, it is undisputed that the truck had made its way to Arizona by August 24, 1995, when Arizona issued the certificate of title to Sonny Nicholas. It is further undisputed that Onyx never re-perfected its security interest in the truck and did not attempt to repossess it until November of 1998, well after the four-month grace period

had elapsed. Therefore, Mahana qualified as a bona fide purchaser, and his interest in the truck was superior to that of Onyx.

¶ 18 Our interpretation of the applicable U.C.C. provisions is consistent with that of the Arizona Court of Appeals in a case relied on by the district court, *Arrow Ford, Inc. v. W. Landscape Constr. Co.*, 23 Ariz.App. 281, 532 P.2d 553 (1975). The court in *Arrow Ford* held:

> The UCC's establishment of a four-month period of protection was an attempt to insure a definite cut-off period for the determination of rights and priorities of liens. Our holding effectively attains that goal. At the expiration of the four-month period, either the secured party has reperfected and has priority over subsequent interest holders or fails to reperfect and loses his priority.

*Id.* at 558 (interpreting a prior version of Article 9).

¶ 19 Our interpretation is also supported by the views of the U.C.C. commentators. The seventh official comment to section 9–103 of the U.C.C. explains:

> After the four month period or the remaining period of effectiveness, whichever is shorter, the secured party must comply with perfection requirements in [the new] state.... The four month period is long enough for a secured party to discover in most cases that the collateral has been removed and refile in [the new] state; thereafter, if he has not done so, his interest, although originally perfected in the jurisdiction from which the collateral was removed, is subject to defeat here [in the new state] by purchasers of the collateral.

U.C.C. § 9–103 (1998).

¶ 20 In urging us to hold that its interest in the truck was superior to that of Mahana, Onyx focuses exclusively on the Bona Fide Purchaser provision. Onyx argues that Mahana was entitled to bona fide purchaser status only if he gave value and received delivery of the truck *after* the issuance of a Utah certificate of title that reflected no lien. Under Onyx's proposed interpretation, bona fide purchaser status is available only to those purchasers who purchase goods in reliance on a clean certificate of title issued by the state in which the purchase occurs.

¶ 21 Onyx's proposed interpretation is inconsistent with the statutory language. Were we to accept Onyx's interpretation of the Bona Fide Purchaser provision, it would render the Governing Law provision meaningless. Under the Governing Law provision, the issue of perfection is "governed by the laws ... of the jurisdiction issuing the certificate until four months after the goods are removed from that jurisdiction and thereafter *until the goods are registered in another jurisdiction,* but in any event not beyond surrender of the certificate." Utah Code Ann. § 70A–9–103(2)(b) (1999) (emphasis added) (repealed effective July 1, 2001); Ariz.Rev.Stat. § 47–9103(B)(2) (1999) (repealed effective July 1, 2001). Accordingly, it was only during the first four months after the truck was moved to Arizona that Onyx's California lien could trump the Arizona certificate of title. The statutory scheme does not contemplate the resuscitation of the California lien after the vehicle has been moved to and titled in another state. Nor does the Bona Fide Purchaser provision contain any language suggesting that bona fide purchaser status is available only to those consumers who purchase a vehicle in the same state that issued the certificate of title free of any liens.

¶ 22 Onyx's proposed interpretation is similarly inconsistent with the statutory purpose, which is to establish a period of time during which a security interest may be re-perfected, and after which consumer purchasers may rely on unencumbered certificates of title without risk of loss due to unknown liens. An interpretation that would allow the revival of a previously extinguished security interest simply because collateral is moved to a new jurisdiction is inconsistent with this statutory purpose.[2]

2. In any event, the interpretation urged by Onyx would not change the result under the facts presented here. Assuming for the sake of argument that Mahana's purchase of the truck provided Onyx with an additional four-month grace period in which to re-perfect its security interest, Onyx's interest would nevertheless be inferior to that of Mahana because Onyx did not assert any interest in the truck until nearly three years from the issuance of the Utah title.

99

¶ 23 In urging us to hold that its interest takes priority over Mahana's, Onyx relies on *Commercial National Bank v. McWilliams,* 270 Ark. 826, 606 S.W.2d 363 (1980). In *McWilliams,* the Arkansas Supreme Court sided with a lienholder against a downstream purchaser who had purchased a motor home in a different state from the one in which the lienholder had perfected its interest. *Id.* at 365. In *McWilliams,* however, the purchaser did not rely on a clean certificate of title. *Id.* Although the purchaser was eventually able to procure a clean certificate of title, he did not do so until *after* the lienholder had brought a legal action seeking to foreclose its lien. *Id.* Because the purchaser had not relied on the issuance of a clean certificate of title, he did not qualify as a bona fide purchaser under U.C.C. Article 9. *Id.*

¶ 24 Unlike the purchaser in *McWilliams,* Mahana is entitled to protection as a bona fide purchaser because he purchased the truck after Arizona had issued a clean certificate of title and because Onyx failed to assert any claim to the truck until long after the four-month statutory grace period had expired. We accordingly affirm the decision of the district court with respect to Onyx's liability for conversion.

## II.  COMPENSATORY DAMAGES

¶ 25 We now turn to Onyx's claims regarding the propriety of the compensatory damage award. Onyx contends that the compensatory award of $11,880 was excessive because Onyx deprived Mahana of the use of his truck for only eighteen months, yet the award was greater than the amount Mahana originally paid for the truck. Whether the district court applied the correct rule for measuring damages is a question of law that we review for correctness. *Lysenko v. Sawaya,* 2000 UT 58, ¶¶ 17, 23, 7 P.3d 783. Whether the amount awarded by the district court was supported by the evidence is a determination of fact that may be reversed on appeal only if clearly erroneous. *Id.* at ¶ 16. We first consider the legal question of whether the district court applied the appropriate measure of damages.

¶ 26 To the extent possible, the fundamental purpose of compensatory damages is to place the plaintiff in the same position he would have occupied had the tort not been committed. *Id.* at ¶ 22 (citing Restatement (Second) of Torts § 903 cmt. a (1979)). Generally, the measure for damages in a conversion action is the value of the converted property at the time of conversion, plus interest. *Id.* at ¶ 18 (citing *Broadwater v. Old Republic Sur.,* 854 P.2d 527, 531 (Utah 1993)); *Madsen v. Madsen,* 72 Utah 96, 102, 269 P. 132, 134 (1928). This measure is appropriate because the remedy for conversion is analogous to a forced sale of the converted property from the plaintiff to the defendant. *See* 18 Am.Jur.2d *Conversion* § 105 (1985).

¶ 27 When a plaintiff is awarded the value of his property at the time of the conversion, he is not entitled to additional damages for the loss of use of his property. *See Henderson v. For-Shor Co.,* 757 P.2d 465, 470 (Utah Ct.App.1988); 18 Am.Jur.2d *Conversion* § 118 (1985). Allowing a plaintiff to recover both market value and damages for loss of use would be tantamount to an award of double damages inasmuch as it would equate to charging the defendant for the property and then continuing to charge rent for its continued possession.

¶ 28 Although the market value of the converted property is ordinarily the basis for ascertaining damages in a conversion action, alternative measures of damages may be appropriate in extraordinary cases. For example, damages based on the value of the plaintiff's loss of use of the converted property may be appropriate in cases where the defendant returns the converted property or where evidence is lacking regarding the market value of the converted property at the time of conversion. *See* 18 Am.Jur.2d *Conversion* § 118 (1985).

¶ 29 In this case, the district court correctly concluded that it was appropriate to base the compensatory award on the value of Mahana's lost use of the truck, rather than on the value of the truck at the time of its conversion. The district court could not base its compensatory award on the market value of the truck at the time of the conversion

because the parties presented no evidence as to that value. Moreover, following Onyx's conversion of the truck, Mahana was not in a position to replace it because he was still making payments on the original loan to Zions Bank. Finally, basing the compensatory award on the value of the truck at the time of the conversion would not constitute an accurate measure of damages inasmuch as Onyx returned the truck following the district court's ruling on liability, but prior to the trial on damages.

¶ 30 Having concluded that it was appropriate for the district court to base its compensatory award on a calculation of the value of Mahana's lost use of the truck, we address Onyx's challenge to the amount of the award. The district court arrived at the value of Mahana's lost use by relying on the retail rental value of small vehicles such as those that Rick Warner Toyota provided to Mahana as a courtesy. Onyx asserts that the award based on the rental value of these vehicles was excessive because it was greater than the amount Mahana originally paid for the truck.

¶ 31 Onyx's challenge to the particular amount of the compensatory award is a question of fact that we will reverse only if clearly erroneous. *See Lysenko*, 2000 UT 58 at ¶ 16, 7 P.3d 783. For the reasons explained herein, we find no clear error in the district court's use of the retail rental cost of replacement vehicles as the measure of the value of Mahana's lost use, even though it resulted in an award that exceeded the purchase price of the truck.

¶ 32 In setting the compensatory award, the district court considered a number of factors. These included the purchase price of the truck, the retail rental value of comparable trucks, and the retail rental value of small cars such as those Rick Warner Toyota provided to Mahana. The court settled on the retail rental value of small cars, despite the fact that such cars were not comparable to the converted property. The court observed:

> [Mahana] couldn't tow jet skis, haul items for personal use or go camping with the [replacement] cars. There was [also] sentimental value to Mr. Mahana from having a pickup truck as opposed to a car. Frankly the court is cognizant that this 19 year old single male went from a pickup truck ... equipped with a CD player, amplifier and additional speakers to a Dodge Neon. The ride, for him, was just not the same.

¶ 33 The district court determined that using the retail rental value of small pickups would result in an "inequitable windfall for the plaintiff," because the resulting figure of $21,600 so greatly exceeded the $9,000 purchase price of the truck. Recognizing that some measures of the value of lost use would result in an inappropriately large award, the district court moderated the lost use calculations by basing them on the retail rental value of small cars such as those that Rick Warner Toyota provided to Mahana during the period he was without his truck.[3]

¶ 34 Onyx argues that it was clearly erroneous for the district court to award damages in excess of the amount Mahana originally paid for the truck. We disagree. When property is wrongfully taken by another, it is possible for the resulting consequential damages to exceed the amount paid for the property. Lost use, a form of consequential damages, may appropriately be used to measure the damages resulting from a conversion in circumstances such as these. Because such consequential damages bear no necessary relationship to purchase price, we find no clear error in the fact that the compensatory award exceeds the purchase price of the truck.

**3.** The district court held that the collateral source rule barred any reduction to the compensatory award based on the value of the replacement vehicles that Rick Warner Toyota provided to Mahana. While Onyx appears to suggest that the compensatory award was excessive because Mahana had the use of these vehicles on a complimentary basis, Onyx fails to challenge this particular application of the collateral source rule on appeal. Onyx does, however, challenge the district court's reliance on the collateral source rule in refusing to reduce the compensatory damage award by the amount Mahana recovered from a bond posted in Arizona. *See* part III *infra*.

## III. OFFSET AND THE COLLATERAL SOURCE RULE

¶ 35 Onyx also maintains that the district court erred by refusing to reduce the compensatory award by the amount Mahana recovered from a bond posted at the time the state of Arizona issued a clean certificate of title for the truck. The district court based its refusal to reduce the award on the collateral source rule. Whether the district court was correct in its application of the collateral source rule is a question of law that we review for correctness, without deference to the district court's conclusions. *See Paulson v. Allstate Ins. Co.*, 2003 WI 99, ¶ 19, 263 Wis.2d 520, 665 N.W.2d 744.

¶ 36 Before issuing an unencumbered replacement title to Sonny Nicholas, the state of Arizona required that Nicholas post a bond. Both Mahana and Onyx subsequently applied for recovery under the bond, asserting that they had been damaged by virtue of the issuance of the replacement title. Prior to the trial on damages, the bonding company paid each claimant a portion of the bond proceeds. Onyx asserts that the district court erred in refusing to offset its liability to Mahana by the portion of the bond proceeds that he recovered.

¶ 37 The district court correctly ruled that the collateral source rule barred any consideration of the bond proceeds. " 'The collateral source rule provides that a wrongdoer is not entitled to have damages, for which he is liable, reduced by proof that the plaintiff has received or will receive compensation or indemnity for the loss from an independent collateral source.' " *Gibbs M. Smith, Inc. v. U.S. Fid. & Guar. Co.*, 949 P.2d 337, 345 (Utah 1997) (quoting *DuBois v. Nye*, 584 P.2d 823, 825 (Utah 1978)); *see also* Restatement (Second) of Torts § 920A (1979). The rule applies even in those cases where it results in a windfall to the plaintiff based on the premise that the plaintiff victim, rather than the defendant tortfeasor, should be the beneficiary of any windfall.

¶ 38 Onyx argues that the district court's application of the collateral source rule unfairly gives the plaintiffs "the unilateral benefit of the bond funds." We disagree with Onyx's characterization. The Arizona bond provided partial compensation to both Onyx and Mahana. Had the district court permitted Onyx to offset its damages by the amount of the bond paid to Mahana, Onyx would have been the party receiving the "unilateral benefit" of the bond. There was no reason for the district court to shift the benefit of the bond solely to the tortfeasor Onyx.

¶ 39 Onyx asserts that the collateral source rule is applied most often to insurance recoveries, where victims have paid premiums, and where it would consequently be unfair to shift the benefit of such recovery to tortfeasors. Onyx maintains that the rule should not be applied in cases such as this, where the plaintiff has not contracted for the collateral recovery. The rule is not limited, however, as Onyx suggests. Rather, the collateral source rule is applicable unless the collateral recovery comes from the defendant or a person acting on his behalf.

> If the benefit was a gift to the plaintiff ... or established for him by law, he should not be deprived of the advantage that it confers. The law does not differentiate between the nature of the benefits, so long as they did not come from the defendant or a person acting for him.

Restatement (Second) of Torts § 920A cmt. b (1979).

¶ 40 Onyx contends that its claim to the bond proceeds was equal in strength to Mahana's. Accordingly, it reasons that the bonding company actually acted on Onyx's behalf in paying some of the funds to Mahana, thereby removing the funds from the scope of the collateral source rule. We disagree. The rationale for not extending the collateral source rule to proceeds originating from the defendant is based on the recognition that a defendant should not have to pay damages twice. That is not the situation here. Onyx can make no argument that it was the source of the bond proceeds or that it has been forced to pay for damages twice. Moreover, the bond proceeds were not paid to Mahana to compensate him for damages suffered as a result of Onyx's tortious acts, but rather for damages arising from the actions of the individuals who purchased the bond and wrongfully obtained the Arizona

certificate of title. In no sense did the bonding company act on behalf of Onyx in paying the bond proceeds to Mahana.

¶ 41 Finally, Onyx urges us to overturn the district court's application of the collateral source rule because Onyx was innocent of laundering the certificate of title in Arizona. We decline to do so. The fact that Onyx was an innocent victim of a prior tort, the Arizona title-laundering, is simply not relevant in assessing the propriety of the damage award at issue here. The injury for which damages were awarded in this case arose when Onyx's agents hauled Mahana's truck away from his workplace and off to Nevada where it could be sold beyond the reach of Mahana's legitimate claims. The fact that Onyx played no part in laundering the title does not excuse it from the status of tortfeasor for the purposes of applying the collateral source rule in this case.[4]

## IV.  PUNITIVE DAMAGES

¶ 42 Onyx challenges the district court's award of punitive damages on the basis that the statutory provisions governing Onyx's claim to the truck were sufficiently unclear so as to preclude a finding that Onyx acted in bad faith. In short, Onyx asserts that it cannot be tagged with punitive damages because it relied upon a good faith, but ultimately incorrect, interpretation of the law.

▮▮▮ ¶ 43 Onyx's argument is misplaced because the district court's award of punitive damages was not premised on a frivolous or malevolent misuse of spurious legal theories by Onyx. Rather, it was based on Onyx's "knowing and reckless indifference toward and . . . disregard of the rights of Chris Mahana, Rick Warner Toyota and Zions Bank." Onyx fails to appreciate the distinction between a good faith dispute over the resolution of competing claims to the truck and respect for the fact that another party has a reasonable claim to the truck.

▮▮▮ ¶ 44 Onyx's argument equates to the assertion that an award of punitive damages is never appropriate where the law determining underlying liability may fairly be interpreted to support the defendant's position. Punitive damages, however, are not limited solely to abuses of legal process. The presence of a colorable underlying legal argument is not a license to act in reckless disregard of the potential rights of others. Utah law recognizes that punitive damages may be based on egregious conduct. It contains no requirement that the extent of a person's rights relative to others must be so clear as to be beyond reasonable dispute before those rights are capable of being recklessly disregarded.

> [P]unitive damages may be awarded only if . . . it is established by clear and convincing evidence that the acts or omissions of the tortfeasor are the result of willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.

Utah Code Ann. § 78–18–1(1)(a) (2004).

¶ 45 The district court's factual findings, which Onyx does not challenge on appeal, satisfy this standard. The district court specifically found that Onyx had substantial reason to doubt the priority of its lien, and that it ordered repossession of the truck without making any effort to ascertain the current status of title. Although Zions Bank had notified Onyx that Zions Bank was the sole lienholder listed on the truck's Utah certificate of title, Onyx ordered that the truck be removed from the state "ASAP" and sold, ignoring substantial evidence that it should not have proceeded. In addition, Onyx made

---

4.  Onyx also argues that the district court erred in applying the collateral source rule here inasmuch as the rule would be inapplicable in certain hypothetical situations that Onyx characterizes as comparable. Under Onyx's first hypothetical, Onyx argues that the bond funds would have been available to offset Onyx's liability had the bonding company interpled the funds into the court. Under the second hypothetical, Onyx argues that it could have applied for the bond proceeds rather than repossessing Mahana's truck.

These hypothetical situations are not analogous. The second hypothetical amounts to the argument that the collateral source rule would not apply had Onyx not converted Mahana's truck. There can be no quarrel with that proposition, but it completely misses the mark. The first hypothetical is also wide of the mark because it assumes the simultaneous adjudication of the Arizona title-laundering matter, which did not occur.

no effort to ascertain the legal status of title and right of repossession. It mailed a notice of repossession and intent to sell to the Hartleys' old address in California, even though it knew they no longer lived there. Onyx provided no such notice to Mahana. Moreover, despite the fact that Onyx conducted a sizeable business in automobile loans, it provided its employees with no instruction, training, or guidance and had no established procedure on what to do under circumstances such as this. Finally, Onyx never returned Mahana's personal property that was in the truck at the time of its repossession.

¶ 46 These factual findings are more than sufficient to support the district court's conclusion that Onyx's actions manifested a knowing and reckless indifference toward, and a disregard of, Mahana's rights. We therefore affirm the district court's award of punitive damages.

## CONCLUSION

¶ 47 We affirm the judgment of the district court. The district court correctly ruled that, under the relevant provisions of the U.C.C., enacted into Arizona and Utah law, Mahana qualified as a bona fide purchaser of the truck and Onyx lost its perfected security interest. Onyx was therefore properly held liable for conversion. Under the circumstances of this case, the district court correctly used the value of Mahana's lost use of the truck as the measure of compensatory damages and appropriately calculated the value of that lost use according to the retail rental cost of replacement vehicles. Moreover, the district court correctly applied the collateral source rule to exclude from consideration bond proceeds paid to Mahana. Finally, despite the fact that Onyx's liability for conversion turned on legitimate issues of statutory construction, the district court did not err in awarding Mahana punitive damages.

¶ 48 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice NEHRING concur in Justice PARRISH's opinion.