**2025 UT App 68**

# THE UTAH COURT OF APPEALS

DOLORES RODRIGUEZ AND LAURA RAMIREZ,
Appellants,
*v.*
MILES DIEDE,
Appellee.

Opinion
No. 20230833-CA
Filed May 15, 2025

Third District Court, Salt Lake Department
The Honorable Linda M. Jones
No. 190909222

Brandon C. Stone, Attorney for Appellants

Joseph J. Joyce, Bryan J. Stoddard, and
Jonathan P. Barnes Jr., Attorneys for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN M. HARRIS concurred.

LUTHY, Judge:

¶1 Dolores Rodriguez and Laura Ramirez sued Miles Diede, alleging that an auto accident for which he admitted fault caused them to suffer injuries and incur damages. The jury returned a verdict in favor of Diede. Rodriguez and Ramirez appeal, arguing that references at trial to their use of medical liens and other credit financing to obtain treatment, and to their general unawareness of the amount of medical expenses they had incurred, violated the collateral source rule. We disagree and affirm the judgment below.

BACKGROUND[1]

*The Accident and Alleged Injuries*

¶2     In January 2018, Rodriguez was driving a 2017 Chevrolet Silverado truck at about thirty miles per hour eastbound on 6200 South in West Jordan, Utah, with her seventeen-year-old daughter, Ramirez, riding as a passenger. At the same time, Diede, who was driving a 2006 Chevrolet Silverado truck, made a lefthand turn to also go eastbound on 6200 South. As Diede made his turn and accelerated to about sixteen miles per hour, the right front corner of his truck struck the left rear wheel area of Rodriguez's truck.

¶3     Rodriguez reported that the day after the accident, she began to experience headaches and pain in her neck, shoulder, and arm. She stated that she had trouble sleeping and that her shoulder, neck, and head pain made it difficult for her to do ordinary household tasks. Accordingly, she sought care from a chiropractor (Chiropractor). During his treatment of Rodriguez, Chiropractor sent her for an MRI scan and to a pain specialist (Pain Specialist) for injections in her neck. After some months, Rodriguez felt that Chiropractor's treatment was not helping, and Chiropractor referred her to a different doctor (Doctor). Doctor immediately recommended neck surgery. Knowing that the "surgery was going to keep [her] away from work for a while," Rodriguez explained, she continued working at her job—which entailed doing "tiny soldering" under a microscope—and waited to have surgery because she "wanted to make sure [her] children were okay financially" before she underwent surgery. Eventually,

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 8 n.3, 372 P.3d 629 (cleaned up).

in July 2021, Rodriguez had neck surgery. The "surgery was successful," and she has experienced no lasting neck pain, shoulder pain, or headaches since. The medical expenses Rodriguez incurred for the foregoing care totaled $87,855.08.

¶4 Ramirez reported that she too experienced neck and shoulder pain starting the day after the accident, and she went to Chiropractor for care as well. As with Rodriguez, Chiropractor sent Ramirez for an MRI scan and to Pain Specialist for injections in her neck. And like Rodriguez, after receiving care from Chiropractor for some months, Ramirez "didn't feel any better." She was then seen once by Doctor, after which she visited a physical therapist twice. At her second physical therapy visit, she reported a pain level of two out of ten. At that point, she stopped going to physical therapy. The medical expenses Ramirez incurred for her care to that point totaled $10,636.25.

*Payments Toward Rodriguez's and Ramirez's Medical Bills*

¶5 Rodriguez's auto insurance carrier paid $3,000 from personal injury protection (PIP) coverage toward Rodriguez's bills from Chiropractor and $3,000 from PIP coverage toward Ramirez's bills from Chiropractor. Rodriguez's auto insurance carrier held subrogation rights against Diede's auto insurance carrier for reimbursement of those payments in the event that Diede was found liable for Rodriguez's and Ramirez's injuries. *See* Utah Code § 31A-22-309(6)(a)(i) (stating that "the insurer of the person who would be held legally liable [for personal injuries sustained in an auto accident] shall reimburse the [injured person's] insurer for" PIP payments made by the injured person's insurer).

¶6 To finance her neck surgery, Rodriguez entered into an agreement with a medical financing company, Intermountain Surgical (Intermountain). Under that agreement, Intermountain agreed to pay the bills associated with Rodriguez's surgery in

exchange for both a promise from Rodriguez to repay Intermountain the amount it fronted for the surgery and a lien against any recovery Rodriguez might receive from Diede in litigation. Rodriguez's and Ramirez's various medical providers otherwise did not require immediate payment for their services but, instead, agreed to deferred payments while taking liens against any recovery Rodriguez and Ramirez might receive in litigation. Because of the foregoing arrangements, Rodriguez and Ramirez were able to obtain the medical care outlined above without making any out-of-pocket payments prior to the trial in this case.

*The Lawsuit*

¶7 Rodriguez and Ramirez sued Diede, alleging that he was at fault for the accident and that the accident caused the injuries and damages described above as well as pain and suffering damages. Diede acknowledged that the accident was solely his fault. But he disputed the nature and extent of Rodriguez's and Ramirez's injuries and damages. The case therefore proceeded to a jury trial on the issues of causation and damages.

*Rodriguez and Ramirez's Motion in Limine*

¶8 Prior to trial, Rodriguez and Ramirez filed a motion in limine to prevent Diede "from discussing collateral sources at trial," including "discussion of the use of liens by [their] medical providers" and "discussion of amounts that [they had] paid or [had] not paid out of pocket for their treatment." Diede responded by saying that he did "not intend to present evidence or argument regarding out-of-pocket expenses." But he asserted that he "should not be precluded from raising the issue . . . that some of [Rodriguez's and Ramirez's] medical care was provided on a lien basis for this personal injury case, some with the involvement of a lienholder company specializing in personal injury cases," namely, Intermountain. Diede argued that he was "entitled to

expose, through impeachment, the potential for bias" on the part of medical providers who "hold a litigation lien . . . because they have an interest in helping plaintiffs maximize their financial recovery in [litigation]." He also contended that he should be able to expose Doctor's potential bias based on the notion that because Intermountain referred cases to Doctor both before and after this one, Doctor had an incentive to provide testimony favorable to Rodriguez so that Intermountain would continue to send him cases.

¶9     Rodriguez and Ramirez replied by saying, among other things, that while Diede had "stated that he [did] not plan to discuss out-of-pocket expenses or the lack thereof at trial," he had "not explain[ed] how he could discuss the existence of liens . . . without stating or implying that [Rodriguez and Ramirez had] not paid those expenses out of pocket." They asserted that Utah's collateral source rule prohibits the admission of evidence regarding "how much [plaintiffs have] paid out of pocket or whether they ever paid anything out of pocket" because the lack of out-of-pocket payments could suggest to a jury that the plaintiff's medical bills had been covered by a collateral source. Additionally, they characterized Intermountain's and the medical providers' liens as "subrogation right[s]" and asserted that Utah's collateral source rule prohibits the mention of "subrogation rights because juries don't understand subrogation rights."

¶10    The court ruled that "while the amounts from a collateral source would not be admissible to reduce what [Rodriguez and Ramirez] are allowed to recover," that did not mean that the evidence Rodriguez and Ramirez asked to be excluded was "inadmissible for all purposes." The court explained that "so long as [Diede did] not intend to offer collateral source evidence for the purpose of limiting damages but rather . . . to impeach the credibility of a witness by asking about medical care on a lien basis, that evidence goes to bias, prejudice, or motive, and may be admissible." It also ruled that "to demonstrate bias," Doctor could

be asked about Intermountain paying for Rodriguez's surgery. The court did not specifically address the admissibility of evidence related to out-of-pocket expenses.

*The Trial*

¶11    At trial, Rodriguez, Ramirez, Chiropractor, Doctor, and witnesses familiar with the respective medical providers' bills and billing practices all testified during Rodriguez and Ramirez's case-in-chief, detailing Rodriguez's and Ramirez's symptoms and treatment and the total amount of medical expenses they had incurred. Chiropractor and Doctor each also opined that Rodriguez's and Ramirez's injuries and symptoms were caused by the accident.

¶12    During his cross-examination of Rodriguez, Diede's counsel asked her whether the MRIs she and Ramirez had received had been "performed . . . on a lien basis, L-I-E-N." Rodriguez answered, "I don't know. . . . [T]o be honest with you, I don't . . . know that information." Diede's counsel then asked, "Were you paying attention to what you were getting charged at all?" Rodriguez's counsel objected, explaining in a bench conference that because Rodriguez was "not a medical provider," the question did not go to bias but, instead, was aimed at showing that Rodriguez was "not paying anything out of pocket" and "didn't have to pay anything for this." Diede's counsel contended that questioning Rodriguez about whether she was "paying attention or not paying attention to [what she was] being charged" properly sought to "show[] her attitude and motivation during the process." The court overruled the objection, and Rodriguez answered the question by acknowledging that she had not been "paying attention to what [she was] being charged."

¶13    Diede's counsel also asked Rodriguez whether Pain Specialist's clinic "told [her] that [it] would treat [her] on a lien." Rodriguez answered both, "No," and, shortly thereafter, "I don't

know." Diede's counsel asked Rodriguez if she was aware that Pain Specialist charged her "over $5,000." Rodriguez said that she was not aware of that amount and that she had not been "paying attention to that." Finally, Diede's counsel asked Rodriguez, "[W]ere you paying attention to what you were charged for your surgery?" Rodriguez responded, "No."

¶14 Diede's counsel later engaged in the following exchange with Doctor:

> Q. And in this case you were paid by a company called Intermountain . . . ; is that right?
>
> A. (No audible response.)
>
> Q. So you don't know if Intermountain . . . paid you? Or do you know?
>
> A. I mean, I've been paid, and . . . they had paid me before for surgeries. So if you're telling me that it was Intermountain, then, yeah, it probably was.
>
> Q. Okay. And that's a company that coordinates with and pays for surgeries for people with personal injury claims. Is that your understanding?
>
> A. Yeah, I don't know what their exact business model is, but, yes, I think that's accurate.
>
> Q. And they've sent you patients with personal injury claims before Ms. Rodriguez . . . correct?
>
> . . . .

> A. Yes.
>
> Q. And they've sent you ones after hers, right?
>
> A. Yes.
>
> Q. And is it your understanding that they take a financial interest in the outcome of the personal injury case?
>
> A. I would assume so.
>
> Q. So in other words, if the personal injury claim is successful, they . . . make their money, is that right?
>
> A. I would assume, or they probably wouldn't be doing it. But, yeah.
>
> Q. Okay. So your testimony on the causation issue for the personal injury case helps Intermountain . . . make their money, correct?
>
> A. Yeah.

¶15    No other evidence was presented regarding liens held by Rodriguez's medical providers, the financing agreement between Intermountain and Rodriguez, or out-of-pocket payments made by Rodriguez and Ramirez toward their medical expenses. And no mention was made of Rodriguez's insurance carrier, her PIP coverage, or the fact that the payments that had been made to Chiropractor had come from Rodriguez's insurance carrier.

¶16    In his defense, Diede called a biomechanical engineer, who testified that the accident caused "a speed transfer of about 1.6 miles per hour on [Diede's] vehicle and about 2.1 miles per hour on [Rodriguez's] vehicle." The biomechanical engineer opined

that the impact on Rodriguez and Ramirez was "basically comparable to [traveling at] a very slow walking speed" and "bump[ing] against a wall." Diede also called a physician specializing in physical medicine and rehabilitation who opined that Ramirez's need for initial chiropractic visits was likely attributable to the accident but that her MRI scans and injections were not and that the accident did not cause Ramirez any permanent injury. Diede then called a radiologist who reviewed Rodriguez's and Ramirez's MRI scans and x-rays and said he saw no "objective evidence" to suggest that the accident caused injury to Rodriguez's spine or disc herniations to Ramirez. Finally, Diede called an "academic orthopedic spine surgeon" who opined that Doctor's recommendation for Rodriguez to have neck surgery was "way below the standard of care" because there were no medical indications to support a need for surgery.

¶17    After deliberating, the jury found that "Diede's fault [was not] a cause of the harm claimed by [Rodriguez and Ramirez]," and it therefore did not reach the question of damages. The court entered judgment in favor of Diede, and Rodriguez and Ramirez now appeal. Because the arguments Rodriguez asserts on appeal and the arguments Ramirez asserts on appeal are the same, for simplicity, we hereafter refer to the appellants collectively as Rodriguez.

ISSUE AND STANDARD OF REVIEW

¶18   Rodriguez contends that the district court erred by violating the collateral source rule when it allowed Diede "to elicit testimony . . . regarding liens, subrogation rights, and a lack of out-of-pocket medical expenses paid by" Rodriguez. "The question of whether the [district] court was correct in its application of the collateral source rule is a question of law that we review for correctness, without deference to the [district]

court's conclusions." *Wilson v. IHC Hosps., Inc.*, 2012 UT 43, ¶ 24, 289 P.3d 369 (cleaned up).[2]

ANALYSIS

¶19 "Under the common law collateral source rule, a wrongdoer is not entitled to have damages, for which he is liable, reduced by proof that the plaintiff has received or will receive compensation or indemnity for the loss from an independent collateral source." *Wilson v. IHC Hosps., Inc.*, 2012 UT 43, ¶ 31, 289 P.3d 369 (cleaned up). Rodriguez contends that the district court

---

2. Rodriguez raises a second issue on appeal: "[Whether] the fact that a specific amount was actually charged for medical treatment provided 'some evidence' sufficient to satisfy the 'reasonableness' prong of laying foundation for a medical bill pursuant to the standard laid out in *Stevenett v. Wal-Mart Stores, Inc.*, 1999 UT App 80, ¶¶ 31–32, 977 P.2d 508." At trial, Rodriguez offered more than medical bills to prove that the amounts she was charged were reasonable; "in the interest of caution," she also called "five live witnesses . . . to establish the reasonableness of the charges." She now asks us, in the event that we reverse and remand this case based on the collateral source issue, to clarify whether evidence of "the amount of the actual charges incurred . . . constitutes at least some evidence to establish . . . the reasonable value of medical services provided." Because the collateral source issue does not prompt us to remand this case, and because Rodriguez submitted evidence beyond mere medical bills to establish the reasonableness of those bills at trial, we decline to address this issue. *See Velasquez v. Harman–Mont & Theda, Inc.*, 2014 UT App 6, ¶ 21, 318 P.3d 1188 ("The authority to provide guidance on remand is limited to matters necessary to resolution of the case on remand. If . . . the direction we give may ultimately prove to be irrelevant . . . , any guidance this court offered on those questions would be an impermissible advisory opinion."(cleaned up)).

violated this rule by allowing Diede to elicit testimony regarding the payments made by Intermountain, liens held by Rodriguez's medical providers, and Rodriguez's general unawareness of the amount of medical expenses she had incurred. We disagree.

¶20 As an initial matter, we observe that neither Intermountain's payment to Doctor under a medical financing agreement with Rodriguez nor the willingness of Rodriguez's other medical providers to allow deferred payments in exchange for liens against Rodriguez's potential recovery in litigation qualify as collateral source benefits. Our supreme court's articulation of the common law collateral source rule indicates that the type of benefits to which it refers are "compensation" and "indemnity" that a plaintiff receives to pay for his or her loss. *Id.* (cleaned up); *accord Mahana v. Onyx Acceptance Corp.*, 2004 UT 59, ¶ 37, 96 P.3d 893; *Gibbs M. Smith, Inc. v. U.S. Fid. & Guar. Co.*, 949 P.2d 337, 345 (Utah 1997); *DuBois v. Nye*, 584 P.2d 823, 825 (Utah 1978). Extending credit does not amount to providing compensation or indemnity because the debtor must still pay the cost of the expenses incurred. Likewise, "the existence of a medical lien does not suggest a third-party source of payment; rather, it evidences an unpaid bill." *Lee v. Dennison*, No. 19-cv-01332, 2023 WL 221358, at *1 (D. Nev. Jan. 17, 2023) (cleaned up). And a medical financing company is not a collateral source; instead, it is "an investor in the lawsuit." *Rangel v. Anderson*, 202 F. Supp. 3d 1361, 1373 (S.D. Ga. 2016) (cleaned up); *see also Ronquillo v. EcoClean Home Services, Inc.*, 500 P.3d 1130, 1132 (Colo. 2021) (holding that a medical financing company was not a collateral source under Colorado's statutory collateral source rule because the plaintiff remained "individually liable to [the financing company] for the full amounts billed by her healthcare providers whether or not she obtain[ed] a favorable verdict" against the alleged tortfeasor). Accordingly, evidence that a medical financing company has advanced funds to cover medical expenses does not, by itself, violate the collateral source rule. Nor

does evidence that a plaintiff was treated by a healthcare provider who has not demanded immediate payment but holds a lien on the plaintiff's potential recovery in litigation violate the rule.

¶21 Consistent with the foregoing, Rodriguez does not argue that she received collateral source benefits from Intermountain or her medical providers. Instead, she argues that "even if none of [her] bills [were] paid through collateral sources, [the district court's decision to allow testimony] highlighting a lack of out-of-pocket expenses paid by [her] still" violated the collateral source rule. For this proposition, she relies on our supreme court's decision in *Wilson v. IHC Hospitals, Inc.*, 2012 UT 43, 289 P.3d 369.

¶22 *Wilson* involved a medical malpractice lawsuit. *See id.* ¶ 1. The plaintiffs—a father, mother, and child—alleged that hospital employees had breached their duty of care during the mother's labor and delivery, "resulting in permanent and severe brain damage" to the child. *Id.* ¶¶ 1, 8. Following the child's birth, the parents received collateral source benefits from "the Utah Division of Service for People with Disabilities (DSPD), Medicaid, and other community, state, and federal assistance programs" to help address the child's resulting disabilities. *Id.* ¶ 12. Thus, prior to trial, the plaintiffs "sought, and received, an in limine order excluding collateral source evidence at trial." *Id.* ¶ 2.

¶23 Notwithstanding the order in limine, the defendants made "four explicit references" during trial to the collateral source benefits the plaintiffs had received. *Id.* ¶ 12. For instance, they asked the plaintiffs' life care planner "if she was aware that the [plaintiffs were] already getting respite care from the State of Utah." *Id.* (cleaned up). The life care planner acknowledged, "The parents are getting an annual stipend of money from DSPD, [which] they can use for respite care." *Id.* (cleaned up).

¶24 The defendants also "made ten references" to "the fact that the [parents] had not incurred any out-of-pocket costs in

providing care for [their child]." *Id.* ¶ 13. For example, they asked the plaintiffs' economist whether he had been "informed that the plaintiffs [had] stipulated that there [were] not *out-of-pocket expenses for medical* in [the plaintiffs'] case." *Id.* ¶ 44. Over an objection, the economist answered, "I'm aware that insurance and/or Medicaid have paid most of the expenses." *Id.* (cleaned up). Additionally, in cross-examining the father, the defendants' counsel stated, "We have your *medical expenses*, but we don't have the amount that you've paid for *out-of-pocket expenses*." *Id.* (cleaned up). He then elicited a concession from the father that "he had paid nothing" for the child's "special wheelchair." *Id.* The defendants' "most blatant reference to out-of-pocket expenses occurred during closing argument, when [the defendants] told the jury, '[The child] is getting the hospital and medical care he needs[,] and you have also heard that it's not costing the parents. They're not claiming one cent of out-of-pocket expenses.'" *Id.* ¶ 14 (cleaned up).

¶25 The jury in *Wilson* "returned a verdict finding no negligence on the part of [the defendants]," and the plaintiffs appealed. *Id.* ¶ 22. On appeal, our supreme court first determined that the payments made by DSPD, Medicaid, and private health insurance toward the child's care all qualified as collateral source benefits. *See id.* ¶ 35. It then held that the defendants had violated the collateral source rule, both by referencing those benefits "directly" and by "repeatedly [making] reference to the fact that the [parents] had not incurred any out-of-pocket expenses for [their child's] care." *Id.* ¶ 36. Regarding the references to out-of-pocket expenses, the supreme court explained:

> [O]ut-of-pocket expenses and collateral source payments bear an inverse relationship to each other. That is, where third-party sources pay a portion of a plaintiff's medical expenses, the plaintiff will necessarily have paid a smaller portion of those expenses out-of-pocket. In short, reference to the

> absence of any significant out-of-pocket medical expenses necessarily implies that the expenses have been paid by collateral sources.

*Id.* ¶ 39. The court then observed that its conclusion that the collateral source rule had been violated was "bolstered by [the defendants'] inability to offer a legitimate purpose for the evidence." *Id.* ¶ 44.

¶26 After concluding that the defendants had repeatedly violated the collateral source rule, the court determined that those violations prejudiced the plaintiffs' case. *See id.* ¶¶ 46–51. As a backdrop for its analysis on this point, the court observed that in the medical malpractice context, "the Legislature has passed a statute mandating that, '[u]pon a finding of liability and an awarding of damages by the trier of fact,' [district] courts 'shall reduce the amount of the award by the total of all amounts paid to the plaintiff from all collateral sources which are available to him.'" *Id.* ¶ 32 (quoting Utah Code § 78B-3-405(1), (2)). It further noted, however, that "the statute limits these reductions by prohibiting any reduction in a damages award for collateral sources that have subrogation rights." *Id.* (citing Utah Code § 78B-3-405(1)). Against that backdrop, the court explained that the prejudicial impact of collateral source evidence "is two-fold": "first, the evidence suggests to the jury that the plaintiff is already receiving the care that he needs," thus potentially leading the jury to believe "that the outcome of the trial is immaterial to the party benefitting from the collateral source," and, "second, because most jurors do not understand the concept of subrogation rights, they will erroneously conclude that the plaintiff is seeking a windfall." *Id.* ¶ 47 (cleaned up). Jurors' general inability to understand the subrogation rights at play, the court explained, "is highly prejudicial because the jury will believe that the plaintiff has already been fully compensated and is trying to obtain a double recovery." *Id.* (cleaned up).

¶27 Because the *Wilson* defendants had violated the collateral source rule—including by "repeatedly referencing the fact that the [parents] had not incurred any out-of-pocket costs in providing care for [their child]"—and because the prejudice from that violation could not be cured by explaining to the jury the subrogation rights at play, the *Wilson* court vacated the jury's verdict and remanded the case for a new trial. *Id.* ¶¶ 13, 47, 78.

¶28 Rodriguez now asserts that Diede's counsel's references to liens held by some of Rodriguez's medical providers; Doctor's testimony regarding Intermountain paying for Rodriguez's neck surgery; and Rodriguez's testimony about her lack of knowledge of, or attention to, the amount of medical expenses she was incurring all suggested to the jury a lack of out-of-pocket payments by Rodriguez for her medical expenses. And, pointing to *Wilson*, she contends that those allusions to a lack of out-of-pocket payments toward medical expenses violated the collateral source rule. We are not persuaded.

¶29 In *Wilson*, the jury was explicitly and repeatedly informed that the plaintiffs had received collateral source benefits—payments from government programs and private insurance to cover the expenses occasioned by the harms allegedly caused by the defendants. The jury was not informed of any debt incurred by the plaintiffs to pay for those expenses. In that context, the supreme court rightfully reasoned that repeated direct references to the absence of any significant out-of-pocket medical expenses necessarily implied that the plaintiffs' expenses had been covered by the collateral sources of which the jury had been informed.

¶30 In contrast, the jurors in this case were informed of no collateral source benefits Rodriguez received. Instead, Diede's counsel accurately suggested—through his questioning of both Rodriguez and Doctor—that Rodriguez had financed her medical expenses through liens and an agreement with Intermountain. Under these facts, any resulting inference regarding an absence of

out-of-pocket payments did not necessarily imply that Rodriguez's expenses had been covered by collateral sources. Instead, because the type of subrogation arrangement alluded to here—debt secured by a lien—*is* within the ken of average jurors, a lack of out-of-pocket payments by Rodriguez was likely to lead the jury to infer only that Rodriguez had obtained credit financing but remained ultimately responsible for the cost of her expenses. And to the extent that Rodriguez's failure to confirm her use of medical liens or Doctor's inability to provide the details of Intermountain's agreement with Rodriguez may have left room for ambiguity as to whether Rodriguez's lack of out-of-pocket payments was attributable to debt or to collateral source benefits, that ambiguity was within Rodriguez's control to clarify. For these reasons, we conclude that the district court's admission of testimony regarding Rodriguez's lack of awareness regarding the cost of her medical treatments and Doctor's testimony about receiving payment from Intermountain did not violate the collateral source rule.

¶31　And, just as the *Wilson* court's conclusion that the collateral source rule had been violated was bolstered by the defendants' inability to offer a legitimate purpose for the evidence at issue there, our conclusion is bolstered by the fact that Diede has offered a legitimate purpose for admitting the evidence at issue here. Specifically, we agree with Diede that questions of whether Rodriguez was treated on a lien basis, whether she was paying attention to her medical bills, and whether she knew the specific amounts of those bills "were all relevant to the question [of] whether [she] incurred those expenses in bad faith." As Diede explains, "a jury reasonably could have inferred that incurring medical expenses on credit without paying attention to the specific amounts billed [might] signal[] bad faith, or in other words, that Rodriguez was merely attempting to increase potential damages for this lawsuit." Similarly, Doctor's testimony that he receives referrals and payments from Intermountain was

also relevant because a jury reasonably could have inferred bias based on the notion that if Doctor offered a causation opinion helpful to Rodriguez, Intermountain would be more likely to send him additional referrals.

¶32    In sum, we recognize the rule established in *Wilson* that when a jury is explicitly informed that a plaintiff has received collateral source benefits, then "methodical allusion" to those benefits through repeated references to "the absence of any significant out-of-pocket medical expenses" is a violation of the collateral source rule. *Wilson v. IHC Hosps., Inc.*, 2012 UT 43, ¶¶ 2, 39, 289 P.3d 369. But when a jury is informed of no collateral source benefits and the defendant correctly suggests, instead—for a legitimate purpose such as showing potential bias or bad faith— that the plaintiff used liens or medical financing to obtain treatment, there is no violation of the collateral source rule.

CONCLUSION

¶33    The district court's admission of evidence suggesting that Rodriguez used medical liens and payments from a medical financing company to avoid the need to make out-of-pocket payments toward the medical expenses she allegedly incurred as a result of an accident caused by Diede did not violate the collateral source rule. Accordingly, we affirm.

––––––––––